**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

DONNA ARROYO

                              Petitioner,

     v.                                                   No. 08-CV-971
                                                           (GLS/DRH)

ELIZABETH WILLIAMS, Superintendent of
Bedford Hills Correctional Facility,

                              Respondent.
-----------------------------------------------------------------

**APPEARANCES:**                            **OF COUNSEL:**

DONNA ARROYO
Petitioner Pro Se
No. 99-G-0597
Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills, New York 10507

HON. ERIC T. SCHNEIDERMAN         ALYSON J. GILL, ESQ.
Attorney General for the State            Assistant Attorney General
  of New York
120 Broadway
New York, New York 10271

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

      Petitioner pro se Donna Arroyo ("Arroyo") is currently an inmate in the custody of the New York State Department of Correctional Services ("DOCS") at Bedford Hills Correctional Facility. Arroyo pleaded guilty on April 28, 1999 to murder in the first degree in Schoharie County Court. Am. Pet. (Dkt. No. 6) ¶¶ 1-6. Arroyo was sentenced to, and is

---

    [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

presently serving, twenty-five years to life imprisonment. Id. ¶ 3. Arroyo now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that (1) her plea was not voluntary, knowing, and intelligent, and (2) she is actually innocent of the crime. See Am. Pet. For the reasons which follow, it is recommended that the amended petition be denied.

**I. Background**

On May 12, 1997, Arroyo's estranged husband was shot and killed. P. at 26.[2] On May 22, 1997, Arroyo was arraigned on a felony complaint and, because the charge carried a maximum sentence of death, the Capital Defender Office (CDO)[3] was appointed to represent her. First Caldwell Aff. (Dkt. No. 16-3 at 35-40) ¶ 3. The complaint alleged that Arroyo solicited her boyfriend, Cary McKinley, and McKinley's stepbrother, Daniel Edwards, to murder Arroyo's husband in return for a share of the life insurance proceeds from his death and that Edwards had committed the murder. On May 28, 1997, a grand jury returned an indictment charging Arroyo, McKinley, and Edwards with first degree murder and related offenses. Id. ¶ 4. On January 26, 1998, the prosecution formally indicated an intention to seek the death penalty. Dkt. No. 16-2 at 2; First Caldwell Aff. ¶ 4.

---

[2] "P." followed by a number refers to the pages of the transcript from Arroyo's plea included, in its entirety, with the respondent's answer. Dkt. No. 16-2, 16-3 at 98-130. References are to the pages of the trial transcript and not those on the header of the page

[3] The CDO was created and funded by New York State in 1995 after re-institution of the death penalty in the state. It provides defense services to defendants who face the penalty of death under state law. See generally United States v. Wilson, 354 F. Supp. 2d 246, 247 (E.D.N.Y. 2005).

2

On October 21, 1998, Arroyo, appearing with three attorneys appointed to represent her from the CDO, pled guilty to murder in the first degree.  P. at 28; Dkt. No. 16-3 at 26; First Caldwell Aff. ¶¶ 5-6; see also Dkt. No. 16-3 at 41-44 (plea agreement). During the plea allocution, Arroyo told the judge that she was entering into the "plea freely and voluntarily" (P. at 8), was neither under the influence of drugs nor alcohol (P. at 9), and was free of any physical, mental or emotional illness which would affect her ability to understand the plea proceedings (P. at 9).  Arroyo stated that she understood the charges against her (P. at 9), had discussed her rights and options with her legal counsel and understood her various options (P. at 10, 14-16), was satisfied with her counsel (P. 10), and understood the rights which she was waiving by pleading guilty (P. at 10-17).  The court also reiterated Arroyo's option to continue on to a jury trial.  P. at 22-23.  Arroyo confirmed that, despite prior trepidation, she had no reservations and wished to continue with her plea.  P. at 22-23; see also Dkt. No. 16-3 at 34 (transcript from proceeding prior to plea indicating the court's intention not to take a "tenuous" plea from Arroyo).  Arroyo indicated that she made an agreement for another to kill her husband in exchange for a portion of her husband's life insurance proceeds.  P. at 26-28.  Arroyo also corrected the court's misconception about whether property would also account for a portion of the payment for the murder.  P. at 27-28.  Arroyo pled guilty, and prior to the court officially accepting the plea, the State withdrew its previously filed notice to pursue the death penalty.  P. at 28-30; First Caldwell Aff. ¶¶ 7-8; see also Dkt. No. 16-3 at 131 (prosecution's withdrawal of notice of intent to seek the death penalty dated October 21,

3

1998).⁴

Prior to and during Arroyo's incarceration she received treatment for various psychiatric illnesses including depressive, eating, personality, and an anxiety disorders. First Caldwell Aff. ¶¶ 15-16, 20-22; VanBellingham Aff. (Dkt. No. 16-3 at 46-48) ¶¶ 5-6. Dr. VanBellingham, Arroyo's treating psychiatric, has seen Arroyo "from May 1997 to present, with the exception of a six-week period . . . between August and September 1998 . . . . " VanBellingham Aff. ¶ 4. Arroyo's condition has fluctuated throughout her incarceration. VanBellingham Aff. ¶¶ 8-11. In VanBellingham's opinion, Arroyo was unable "to make a reasoned, intelligent and thoughtful decision to plead in connection with her pleas of guilty . . . . " First Caldwell Aff. ¶ 19; see also VanBellingham Aff. ¶¶ 13-16 . On October 21, 1998, Arroyo began a detailed medication regiment to treat her conditions, but she was not taking this medication at the time of her plea. First Caldwell Aff. ¶ 17; VanBellingham Aff. ¶¶ 12, 15.

On February 18, 1999, Arroyo, through her counsel Randal Caldwell, moved to withdraw her guilty plea.⁵ Second Caldwell Aff. (Dkt. No. 20-1 at 44-45) ¶ 2. On March 15, 1999, the county court heard oral arguments on the motion. Dkt. No. 20-1 at 36-37; Dkt. No. 16-3 at 141 (noting oral argument occurred); Scharf Aff. (Dkt. No. 20-1) ¶ 9. "The

---

⁴Arroyo testified against McKinley at his trial. McKinley was acquitted of all charges. Resp. Mem. of Law (Dkt. No. 14) at 3 n.2. Edwards pleaded guilty to first degree murder and was sentenced to an indeterminate term of twenty-five years to life imprisonment. See People v. Edwards, 274 A.D.2d 754 (3d Dep't 2000), rev'd on other grounds, 96 N.Y.2d 445 (2001).

⁵ The CDO was relieved from its duties as counsel on December 14, 1998 in contemplation of Arroyo's intention to file a motion to withdraw her guilty plea during which she had been represented by the CDO. Dkt. No. 20-1 at 36. Attorney Randal Caldwell was subsequently appointed to represent her. Id.

court took exception to the allegations . . . that [Arroyo] lacked the requisite mental capacity to enter a knowing and voluntary plea of guilty . . . [but also] stated that it was inclined to conduct a hearing." Dkt. No. 20-1 at 36-37; see also Scharf Aff. ¶ 12.  The court reserved judgment.  Dkt. No. 20-1 at 37; Scharf Aff. ¶ 14; Second Caldwell Aff. ¶ 4.

On April 6, 1999, Arroyo's motion was denied. Dkt. No. 16-3 at 132-141; 16-11 at 49-57; People v. Arroyo, 691 N.Y.S.2d 734 (Schoharie County Ct. 1999).  The court found that Arroyo's plea was knowing and voluntary and that no evidentiary hearing was required.  Arroyo, 691 N.Y.S.2d at 736.  The court found that Arroyo (1) offered no evidence of innocence, fraud, or mistake in the inducement of her plea, (2) her contentions that she pled guilty for fear of receiving a harsher sentence were unavailing to establish duress, (3) her contentions of irrational thinking were refuted by transcripts of her plea proceedings and her factual recitation during her allocution,[6] (4) she claimed to be

---

[6] The court relied upon

> [Arroyo's] state[ments] that no one had coerced her to plead guilty, that she was pleading guilty freely and voluntarily, that she was not under the influence of any drugs or alcohol, that she was not taking any medications that affected her ability to understand the plea proceedings, that she did not know of any physical, mental or emotional illness that prevented her from understanding the plea proceedings, that she was over the age of eighteen years and had graduated from high school, that she could read and write the English language, that she understood the charges against her, that she had discussed the facts and circumstances of the case with her attorneys, that she had discussed her constitutional rights and possible defenses with her attorneys (this was confirmed by her attorneys during the plea colloquy), and that she was satisfied with her attorneys. Further, the defendant stated that she understood the specifically enumerated rights related to a jury trial, including the right to appeal a conviction if she were convicted after trial, which she was waiving by her plea.
>
> The plea agreement was reviewed with the defendant and she stated that she had discussed it with her attorneys and understood its terms. The

5

happy, and was competently represented, by three attorneys at her plea, and (4) neither the court nor her attorneys ever found Arroyo mentally unstable throughout the forty separate court appearances she attended and ninety pretrial motions that were filed. Id. at 736-38; Dkt. No. 16-3 at 134-37; 16-11 at 51-54. Moreover, Arroyo "related to the facts of the commission of the crime [and] even corrected the court as to the payment which she agreed to make . . . ." Arroyo, 691 N.Y.S.2d at 737. Additionally, the court found Dr. VanBellingham's affidavit unavailing because she did not see Arroyo around the time of her plea and her descriptions of Arroyo's conditions lack "specificity, clarification, or explanation . . . . " Dkt. No. 16-3 at 138-39; 16-11 at 55-56; Arroyo, 691 N.Y.S.2d at 738. Moreover, the court denied Arroyo's motion to withdraw her plea in light of Hynes v. Tomei for reasons discussed in a similar decision pertaining to an identical motion made by Arroyo's co-defendant. Dkt. No. 16-3 at 140; 16-11 at 57; Arroyo, 691 N.Y.S.2d at 738.

On April 28, 1999, Arroyo was sentenced to an indeterminate term of twenty-five years to life imprisonment. Dkt. No. 16-3 at 26; S.H.[7] During the hearing, Arroyo again expressed that she "did [not] want to plead guilty . . . [and] was afraid of the death penalty." S.H. at 12. Arroyo continued to state that she wished to withdraw her plea of guilty. Id. at 12-13. The court again reiterated that it would not allow Arroyo to withdraw her plea and sentenced her as indicated above. Id. at 14-15.

---

> defendant stated that she had sufficient time to consider her plea and that she was sure that it was what she wanted to do.

Arroyo, 691 N.Y.S.2d at 737.

[7] "S.H." followed by a number refers to the pages of the transcript of Arroyo's sentencing hearing included, in its entirety, with the respondent's answer. Dkt. No. 16-3 at 132-57; 16-12. References are to the pages of transcript and not the header of the page.

On January 23, 2006, Arroyo, through new counsel, Paul J. Connolly, brought a motion pursuant to N.Y. Crim. Proc. Law § 440 seeking to vacate her conviction. Dkt. No. 16-5. Arroyo claimed that her conviction was invalid because, in contravention of Hynes v. Tomei, her guilty plea was accepted while the notice to seek the death penalty was still valid. First Connolly Aff. (Dkt. Nos. 16-5 at 2-10) ¶¶ 14-15. On March 27, 2006, the county court denied the motion to vacate as it "revisit[ed] an issue which was previously addressed by th[e] Court . . . [and it] could have been raised by [Arroyo] on her direct appeal; it is therefore not subject to collateral review . . . ." Dkt. No. 16-7 at 3. On April 4, 2006, Connolly appealed the decision denying the 440.10 motion. Dkt. No. 20-1 at 2; see also Second Connolly Aff. (Dkt. No. 20-1 at 4-19) (affirmation filed with appeal to Third Department) ¶¶ 25-27. "On June 7, 2006, the Appellate Division denied [Arroyo's] application for leave to appeal." Resp. Mem. of Law at 11.

In "January 2007, [Arroyo's] counsel . . . filed a brief on [Arroyo's] behalf in the Appellate Division . . . in which he claimed that the trial court erred in denying petitioner's motion to withdraw her guilty plea." Resp. Mem. of Law at 12. On July 26, 2007, the Appellate Division affirmed Arroyo's judgment of conviction holding that (1) decisions permitting withdrawal of a guilty plea or evidentiary hearings is within the sound discretion of the trial court and (2) based on the record which did not include a claim of innocence and did include a detailed plea allocution, the county court did not abuse its discretion in denying Arroyo's request for a hearing regarding the voluntariness of her plea. Dkt. No. 16-9; People v. Arroyo, 838 N.Y.S.2d 920 (1st Dep't 2007). On July 31, 2007, Arroyo sought leave to appeal the decision to the New York Court of Appeals. Dkt. No. 16-10. On October 2, 2007, the petition was denied. People v. Arroyo, 9 N.Y.3d 959 (2007).

7

### III. Discussion

Arroyo filed this amended petition seeking habeas relief alleging that her guilty plea was not voluntary because (1) she could not voluntarily agree to its terms as a death penalty notice had yet to be withdrawn and (2) she was incapacitated when she entered it due to her mental condition. Am. Pet. ¶ 12, Ground One. Additionally, Arroyo claims that she was actually innocent of the crime to which she pled guilty relying on the fact that (1) one of her co-defendants was acquitted during trial and (2) she has information that a prosecution witness perjured himself at grand jury and used information from a Florida murder to assist in unlawfully bringing an indictment against Arroyo. Id. ¶ 12, Ground Two; Arroyo's Memorandum of Law (Dkt. No. 20) at 7-8. Respondent contends that (1) Arroyo's plea was neither rendered invalid, (2) Arroyo was not incapacitated at the time she entered her plea, and (3) Arroyo's claim that she is actually innocent is deficient.

### A. Guilty Plea

The ultimate question of whether a guilty plea was knowing and voluntary is a question of federal law. See Marshall v. Lonberger, 459 U.S. 422, 431 (1983). It is well settled that "[t]he longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (internal quotation marks and citations omitted). A plea of guilty is considered voluntary when entered by one fully aware of the direct consequences of the plea. Bousley v. United States., 523 U.S. 614, 618-19 (1998) (quoting Brady v. United States, 397 U.S. 742, 748-57 (1970)); see also

Miller v. Angliker, 848 F.2d 1312, 1320 (2d Cir. 1988) ("[A plea] is deemed 'voluntary' if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally") (citations omitted).  A plea of guilty is intelligent if the defendant is 1) advised by competent counsel, 2) in control of his mental faculties, and 3) made aware of the nature of the charge against him.  Bousley, 523 U.S. at 618-19; see also Miller, 848 F.2d at 1320 ("[A] plea is deemed 'intelligent' if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way.") (citations omitted).  Thus, a guilty plea is knowingly, intelligently, and voluntarily entered, when the court has advised the defendant of the consequences of the plea and conducted a sufficient inquiry to assure itself that defendant plead guilty because he was actually guilty.

The Supreme Court has also provided guidance about the legitimacy of guilty pleas in death penalty cases.  In United States v. Jackson, the Supreme Court held that a Federal Kidnaping Act, which allowed for the death penalty as a possible sentence, placed "an impermissible burden upon the exercise of a Constitutional Right" because the statute encouraged defendants to plead guilty and forgo their right to a trial in order to avoid the possibility of having the death penalty imposed.  390 U.S. 570, 572, 581-82.  However, the Supreme Court later held that:

> Jackson ruled neither that all pleas of guilty encouraged by the fear
> of a possible death sentence are involuntary pleas nor that such
> encouraged please are invalid wheth[er] involuntary or not.
> Jackson . . . neither fashioned a new standard for judging the
> validity of guilty pleas nor mandated a new application of the test
> theretofore fashioned by courts and since reiterated that guilty
> pleas are valid if both 'voluntary' and 'intelligent.'

Brady v. United States, 397 U.S. 742, 747 (1970); see also Parker v. North Carolina, 397

9

U.S. 790, 795 (1970) ("[A]n otherwise valid plea is not involuntary because induced by the defendant's desire to limit the possible maximum penalty to less than that authorized if there is a jury trial.").

In this case, the county court and Appellate Division both applied this standard and determined that the record and plea allocution established that Arroyo's plea was both knowing and voluntary. On collateral attack, the county court engaged in a detailed discussion about the plea colloquy, noting that Arroyo's statements indicated that she had conferred with counsel; was happy with her representation; understood the ramifications of pleading guilty and the rights she was waiving; she was free of any impairment or defect, including any medication, which would interfere with her ability to make this decision; and felt, although initially nervous about the plea, that it was now what she truly wanted to do.

Arroyo argues that this discussion was an unreasonable application of the above stated Supreme Court precedent because she was incapable of voluntarily pleading guilty while a death penalty notice was still in existence. See Hynes v. Tomei, 92 N.Y.2d 613, 630 (N.Y. 1998) (holding that "a defendant may not plead guilty to first degree murder while a notice of intent to seek the death penalty is pending . . .," as it is unconstitutional). First, this argument is factually unavailing because the plea hearing transcript indicates that the death penalty notice was withdrawn prior to the county court accepting Arroyo's plea. However, even if this were not the case, these actions still do not amount to an unreasonable application of law. Subsequent New York case law has clarified this issue and reached identical conclusions to that of Brady, namely that "any Jackson-Hynes infirmity does not — in and of itself — render invalid an otherwise valid guilty plea." People v. Edwards, 96 N.Y.2d 445, 454 (N.Y. 2001). Accordingly, consistent with the discussion

10

above, the New York State courts have determined that the appropriate test to determine the validity of a guilty plea, even in death penalty cases, remains an investigation into whether the plea is voluntary and intelligent.

As referenced above, the plea colloquy was extensive and determinative of the fact that Arroyo voluntarily and intelligently pled guilty to first degree murder. Arroyo's claims are belied by the record in which she expressed (1) an understanding of her rights and the subsequent waiver of those rights which would occur upon her plea being accepted, (2) that she was satisfied with her counsel and had received ample advice from them on the strengths, weaknesses, and potential strategies involved in her case, (3) she was mentally and physically capable of entering her plea, (4) she had not been threatened, forced or coerced into pleading guilty, and (5) that she was entering this plea freely and voluntarily. Also, Arroyo admitted to participating in a scheme to kill her husband and further clarified details of the arrangement which ultimately led to his death.

Thus, Arroyo's plea was knowing, voluntary and intelligent and the Third Department's decision is adopted that rejected Arroyo's claim that her plea was invalid. Accordingly, Arroyo's petition should be denied on this ground.

### B. Incapacity

It is well-settled that it is a violation of due process to convict an individual while he or she is legally incompetent. See generally Pate v. Robinson, 383 U.S. 375, 378 (1966) (citations omitted). A defendant is incompetent to proceed if his "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense . . . ." Drope v.

11

Missouri, 420 U.S. 162, 171 (1975).  Thus, federal case law has determined the standard for incompetency as whether the "defendant has present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." Id. at 172 (internal quotation marks and citations omitted).  State court trial judges have been directed to evaluate the necessity of competency hearings based upon "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial . . . but . . . even one of these factors standing alone may, in some circumstances, be sufficient." Id. at 180.  While the refusal to hold a competency hearing when such circumstances arise as to indicate one is necessary represents a violation of both state and federal statutes, as well as due process, absent reasonable doubts about competency, no hearing is required.  Johnson v. Keane, 974 F. Supp. 225, 230 (S.D.N.Y. 1997); see also Pate, 383 U.S. at 385-86 (granting habeas relief where a state court failed to hold a competency hearing which was reasonably justified).

New York state law requires a trial court to hold a competency hearing "when the demeanor of the defendant or other evidence raises doubts as to his competence to stand trial." Johnson, 974 F. Supp. at 230 (internal quotation marks and citations omitted).  This standard is virtually identical to the federal one previously articulated.  "The determination whether there is reasonable cause to believe that the defendant is not fit to stand trial rests within the discretion of the trial judge." Id. (citations omitted).  "Upon review, an appellate court owes deference to the trial court's determinations, in recognition of the trial court's superior opportunity to observe the defendant during the pretrial and trial proceedings." Id. at 231 (internal quotation marks and citations omitted).

If the trial judge had reasonable cause to suspect Arroyo was incompetent, the judge would have been in violation of state and federal law by not ordering a hearing. Arroyo essentially argues that this was the case, as her mental condition impaired her ability to plead guilty. However, the county court found such arguments unavailing. During her plea, the trial judge engaged in a lengthy discussion with Arroyo, where Arroyo stated that she was not coerced; was acting voluntarily; was free of any disease, defect or medication which would cloud her judgment; and was not under the influence of drugs or alcohol. Arroyo answered all questions cogently and indicated that she understood the ramifications of the decision she was making and the rights she was waiving. Additionally, Arroyo appeared approximately forty times in front of the judge, never once giving the court an indication that she was unfit to proceed. Even though Arroyo submitted an affidavit from a mental health professional, this was unavailing as, unlike the trial judge, the psychiatrist had not observed Arroyo immediately prior or during her plea and therefore could not reasonably comment on her mental status. Further, any allegations by the psychiatrist of mental illness were vague, lacking in the requisite specificity to establish reasonable cause. Such determinations, and the lack of any objective evidence of irrational behavior, inappropriate demeanor, or medical opinions indicating otherwise, support the decision not to order a hearing and should be given deference.

Additionally, Arroyo's three attorneys also did not find that she was unfit to proceed. Arroyo's counsel submitted approximately ninety pretrial motions, and a request for a competency hearing was not among them. "Defense counsel . . . may be in an even better position than the trial judge to evaluate a defendant's capacity . . . [thus there is immense] importance [in] defense counsel's opinion in determining when circumstances call for a

13

hearing." Johnson, 974 F. Supp. at 231; see also Drope, 420 U.S. at 177 n.13 ("Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, an expressed doubt in that regard by one with the closest contact with the defendant is unquestionably a factor which should be considered.") (citations omitted).  The fact that Arroyo's own three attorneys never requested a competency hearing, though they were very engaged in motion practice and seeking other various forms of pre-trial relief, also belies any claims of incompetence at the time of the plea.  Pate, 383 U.S. at 845 ("The conclusive factor is that [defendant's] own lawyers, the two men . . . [who] hade the closest contact with the defendant . . ., never suggested he was incompetent to stand trial and never moved to have him examined on incompetency grounds . . . . ").

Accordingly, for the reasons relied upon by the trial judge and affirmed by the Appellate Division, the petition on this ground should be denied.

### C. Actual Innocence

A federal right to be "released [from prison] upon proof of actual innocence . . . is an open question . . . [with] some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet." District Attorney's Office for Third Judicial Dist. v. Osborne, 129 S. Ct. 2308, 2321 (2009) (citing House v. Bell, 547 U.S. 518, 554-55 (2006) (declining to resolve issue of whether freestanding innocence claims are cognizable yet commenting that, even if in existence, petitioner failed to meet such a claim's elevated burden); Herrera v. Collins, 506

U.S. 390, 398-405 (1993)); see also Friedman v. Rehal, 618 F.3d 142, 159 (2d Cir. 2010) (discussing unresolved status of federal constitutional right to be released upon proof of actual innocence and the elevated burden such a claimant would be required to meet). "[T]he absence of any Supreme Court decision concerning this type of claim [provides] . . . no basis for concluding . . . [that there was] an unreasonable application of clearly established Federal law as determined by the Supreme Court . . . ." Hines v. Miller, 318 F.3d 157, 164 (2d Cir. 2003).  Thus, there is no basis for habeas relief.

However, assuming such an actual innocence claim was available, Arroyo has failed to establish facts sufficient to receive such relief.  "[T]he threshold showing for such an assumed right would necessarily be extraordinarily high." Herrera, 506 U.S. at 417.  In a previous decision discussing the intricacies of an actual innocence claim, the Supreme Court stated in Schlup that "[t]o be credible, [claims of actual innocence] . . . require[] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eye witness accounts, or critical physical evidence . . . ." Schlup v. Delo, 513 U.S. 298, 324 (1995).  However, later decisions indicate that the Supreme Court would "require[] more convincing proof of innocence than Schlup," for a claim of freestanding innocence to stand. House, 547 U.S. at 555.

In this case, Arroyo protested her innocence at sentencing but has neither now nor then supported this assertion with any reliable factual information.  Arroyo relies upon the fact that her co-defendant was acquitted and conclusory statements about potential perjury pertaining to a potential State's witness.  The acquittal is not dispositive of any involvement Arroyo had in the case and her latter claims of perjury are not supported by any type of

15

sworn statements, only Arroyo's bald assertions. Thus, to the extent this represents new evidence, it is woefully lacking in credibility. Moreover, Arroyo's allocution transcript belie these claims, as she then indicated under oath that she arranged for her husband to be killed and intended to pay for such services by providing her co-defendants not with title to property as the court had mistakenly believed, but with a portion of her husband's life insurance. Accordingly, Arroyo has not presented any evidence to establish actual innocence, let alone satisfying the extremely high standard required to sustain such a claim.

Therefore, Arroyo's petition on this ground should be denied.[8]

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO**

---

[8] Given the recommendation herein that Arroyo's petition be denied on its merits, the procedural bars to her petition raised by respondent need not be addressed. If the recommendation is not accepted, it is further recommended that this matter be referred back to the undersigned for consideration of respondent's procedural claims.

 OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE

APPELLATE REVIEW.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y

of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


**IT IS SO ORDERED.**

Dated: March 24, 2011
       Albany, New York

                                                                                                  _David R. Homer_
                                                                                 United States Magistrate Judge